1
2
3
4
5
6
7

8          UNITED STATES DISTRICT COURT

9          SOUTHERN DISTRICT OF CALIFORNIA

10

11 | DAVID MEYER *et. al.,*              Case No.:  15-CV-2405-WVG

12 |                        Plaintiffs,  **ORDER (1) GRANTING-IN-PART**

13 | v.                                  **DEFENDANTS' MOTION FOR**
                                         **PARTIAL SUMMARY JUDGMENT;**
14 | CAPITAL ALLIANCE GROUP *et. al.,*   **(2) GRANTING-IN-PART**
                                         **DEFENDANTS' MOTION TO**
15 |                        Defendants.  **DISMISS; and (3) DENYING**
                                         **PLAINTIFFS' MOTION FOR**
16                                       **PARTIAL SUMMARY JUDGMENT.**
17
18                                       **[Doc. Nos. 48, 49, 50, 61 & 76.]**
19
20

21        In this action, Plaintiffs allege they received unlawful facsimile advertisements and

22 telemarketing calls in violation of the Telephone Consumer Protection Act ("TCPA") and

23 other federal and state statutes and regulations.  Pending before the Court are cross-motions

24 for partial summary judgment and a motion to dismiss the Second Amended Complaint

25 ("SAC").  As explained below, Defendants' summary judgment motion is GRANTED-IN-

26 PART, their motion to dismiss is GRANTED-IN-PART, and Plaintiffs' summary

27 judgment motion is DENIED.  Ultimately only Claims One and Three, both under the

28 TCPA, remain from the Second Amended Complaint.

## I.   CASE SUMMARY

Plaintiffs David Meyer, Arnie Katz, and Ken Moser are individual business owners who maintain fax and telephone lines in furtherance of their businesses.[1]   According to Plaintiffs, Defendant Capital Alliance Group, in its various formulations, is engaged in the business of advertising small business loans through third-party companies, which then illegally sent "junk faxes" and initiated telemarketing "robocalls" on its behalf.[2]   All three plaintiffs received several junk faxes, which they allege ultimately traced back to Defendants.   Plaintiff Moser also received telemarketing calls on his mobile telephone, which he alleges traced back to Defendants.   Plaintiffs brought this action under various state and federal statutes and regulations and ultimately seek treble damages and attorneys' fees based on what they allege is Defendants' longstanding, willful, and knowing pattern of violative conduct.   Trial is scheduled to commence on December 4, 2017.

## II.   DISCUSSION

**A.   Defendants' Motion for Partial Summary Judgment (Doc. No. 50)**

**1.   Legal Standard**

"A party may move for summary judgment, identifying each claim or defense - or the part of each claim or defense - on which summary judgment is sought.   The court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   The party seeking summary judgment bears the initial burden of establishing the basis for its motion and of identifying the portions of the declarations, pleadings, and discovery that demonstrate absence of a genuine issue of material fact.   *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).   The party opposing summary judgment cannot "'rest upon the mere

---

[1] Plaintiff DMC Properties, Inc. ("DCM"), is owned and operated by Meyer, and Plaintiff Venture Support Group, LLC ("Venture"), is owned and operated by Katz.

[2] Defendants Mark Mendoza and Narin Charanvattanakit are Capital Alliance Group's principals.

1  allegations or denials of [its] pleading' but must instead produce evidence that 'sets forth
2  specific facts showing that there is a genuine issue for trial.'" *Estate of Tucker v. Interscope*
3  *Records*, 515 F.3d 1019, 1030 (9th Cir. 2008), cert. denied, 555 U.S. 827 (2008) (quoting
4  Fed. R. Civ. P 56(e)).

5       The moving party has "the burden of showing the absence of a genuine issue as to
6  any material fact, and for these purposes the material it lodged must be viewed in the light
7  most favorable to the opposing party." *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157
8  (1970); *see also Tolan v. Cotton*, 572 U.S. ___, 134 S. Ct. 1861, 1866 (2014).  A fact is
9  material if it could affect the outcome of the suit under applicable law.  *See Anderson v.*
10 *Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  A dispute about a material fact is
11 genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-
12 moving party.  *Id.* at 248.

13      **2.    Claims Two, Seven, and Eight**

14          **a.    Claims Two (Cal. Bus. & Prof. Code § 1758.41, Junk Fax Law) and**
15          **Eight (Cal. Bus. & Prof. Code §§ 17200 *et seq.*, Unfair Competition**
16          **Law)**

17      Defendants contend Plaintiffs lacks standing to bring both Claim Two (the so-called
18 "Junk Fax Law," Cal. Bus. Prof. Code § 1758.41)[3] and Claim Eight (California's Unfair
19 Competition Law ("UCL"), Cal. Bus. Prof. Code §§ 17200 *et seq.*) because they lack the

---

[3]  The Junk Fax Law is part of the series of statutes that are commonly referred to as the
"false advertising law" ("FAL").  *See People ex rel. Kennedy v. Beaumont Inv., Ltd.*, 3 Cal.
Rptr. 3d 429, 443 (Cal. Ct. App. 2003) ("Provisions . . . directed at false advertising are
contained in division 7, part 3, chapter 1, starting with section 17500, which prohibits false
or misleading statements.  For simplicity, we sometimes refer to these provisions as the
'false advertising law.'").  Section 17538.43—which appears in division 7, part 3, chapter
1, article 2 of the Business and Professions Code is contained within the FAL.  This section
specifically regulates the transmission of junk faxes.

measurable economic damages that both statutes require.  (Doc. No. 48 at 16-17; Doc. No. 50 at 12.)[4]  Defendants are correct.

Although an alleged violation of the TCPA is enough to bestow standing under federal law, *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1042 (9th Cir. 2017), the UCL and FAL have a "more limited standing requirement" than the general standing requirement for federal claims, *id.* at 1048.  "Because elements for standing 'are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation.'"  *Troyk v. Farmers Grp., Inc.*, 90 Cal. Rptr. 3d 589, 622 (Cal. Ct. App. 2009) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

To demonstrate standing under the UCL and FAL, Plaintiffs must "(1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., *economic injury*, and (2) show that that economic injury was the result of, i.e., *caused by*, the unfair business practice or false advertising that is the gravamen of the claim."  *Kwikset Corp. v. Superior Court*, 246 P.3d 877, 885 (Cal. 2011) (emphasis in original).

The UCL and FAL's "economic injury requirement is 'more restrictive than federal injury in fact' because it encompasses fewer kinds of injuries."  *Van Patten*, 847 F.3d at 1048-49 (quoting *Kwikset*, 246 P.3d at 886).  To satisfy California's statutory injury-in-fact requirement, a plaintiff must show "a personal, individualized loss of money or property in any nontrivial amount."  *Kwikset Corp.*, 246 P.3d at 887.

Although this bar is not high, trivial, *de minimis*, or non-existent alleged injuries are not sufficient and do not constitute injury-in-fact for UCL and FAL standing.  *Kwikset Corp.*, 246 P.3d at 887 (requiring "nontrivial amount"; noting that where California courts

---

[4] All pin-cite references to documents filed on the Court's CM/ECF system are to the page numbers electronically-generated by the CM/ECF system, not to the documents' native pagination.

have found standing present, "the plaintiff could allege or prove an identifiable monetary or property injury."). For example, in *Van Patten*, the Ninth Circuit found that the plaintiff's receipt of an unwanted text was sufficient to confer Article III standing, but not enough for standing under the UCL. 847 F.3d at 1043, 1049. There, the only economic injury plaintiff alleged was that he was required to pay for receiving defendant's text messages, but the evidence showed that his cell phone plan allowed unlimited messaging, meaning that he had no measurable economic loss. *Id.* at 1049; *see also Reichman v. Poshmark, Inc.*, No. 16-CV-2359-DMS(JLB), 2017 U.S. Dist. LEXIS 36371, at *17-18 (S.D. Cal. Jan. 3, 2017) (finding allegations insufficient where that unsolicited text "advertising uses the paid for and economically valuable text message allotments."); *Olmos v. Bank of Am., N.A.*, No. 15-CV-2786-BAS(BGS), 2016 U.S. Dist. LEXIS 72329, at *10-11 (S.D. Cal. June 1, 2016) ("[T]he allegation that Plaintiff received two short text messages is insufficient to convey standing because the loss of battery life and bandwidth as a result of these two messages was de minimis."). As Defendants point out, this economic damages requirement was the result of California Proposition 64, which amended the UCL and FAL to require economic damages.

In 2004, California voters passed Proposition 64, which amended the UCL and FAL to require plaintiffs to establish economic damages. Plaintiffs here argue that Proposition 64 amended only the UCL and had no impact on the Junk Fax Law as codified in § 17538.43. (Doc. No. 63 at 4.) Plaintiffs are decidedly wrong. Proposition 64 also amended the FAL in the same manner as the UCL. *McGill v. Citibank, N.A.*, 393 P.3d 85, 92 (Cal. 2017) ("In 2004, the voters, by passing Proposition 64, amended [the UCL and FAL] to provide that private individuals may . . . file an action for relief only if they have 'suffered injury in fact and [have] lost money or property as a result of' a violation . . . ."); *Kwikset Corp.*, 246 P.3d at 887 ("Proposition 64 requires that a plaintiff's economic injury come "as a result of" the unfair competition *or a violation of the false advertising law*.") (emphasis added); *Angelucci v. Century Supper Club*, 158 P.3d 718, 728 n.10 (Cal. 2007) ("We note as well that in 2004 the California electorate enacted legislation restricting

previously broad standing requirements for a private right of action under the state unfair competition *and false advertising laws* (Bus. & Prof. Code, §§ 17200 *et seq.*, *17500 et seq.*)") (emphasis added).  Accordingly, section 17538.43 of the FAL requires the same economic injury as the UCL.[5]

Here, Defendants contend none of the three Plaintiffs incurred cognizable economic damages as a result of receiving Defendants' faxes.  The Court agrees and addresses each Plaintiff in turn. In doing so, the Court keeps in mind that Plaintiffs bear the burden of proving they having standing and that "[i]n response to a summary judgment motion [they cannot rest on] . . . mere allegations, but must set forth by affidavit or other evidence *specific facts*, which for purposes of the summary judgment motion will be taken to be true." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (emphasis added; citation and internal quotations omitted); *see also Kwikset Corp.*, 246 P.3d at 888-89 (applying *Lujan* standard to state claim, but at motion to dismiss stage); *Troyk v. Farmers Grp., Inc.*, 90 Cal. Rptr. 3d 589, 622 (Cal. Ct. App. 2009) (same).[6]

### i.      DCM Properties, Inc. and David Meyer

Meyer, DCM's president, testified at deposition that he did not recall whether his fax machine required service after he received Defendants' faxes.  (Defendants' Fact No. 10; Doc. No. 50-3 at 18.)  Meyer testified he pays Vonage a flat rate for fax services and does not pay for individual faxes.  (Defendants' Fact No. 5; Doc. No. 50-3 at 11.)  He did not known how much the junk faxes cost DCM in paper or electricity.  (Doc. No. 50-3 at 21, 24.)  He speculated there might be a limit to the number of faxes he could receive, but did not know whether there was such a limit on his service plan.  (*Id.*)  Additionally, during

---

[5] Because the UCL's economic injury requirement applies equally to the FAL, references to the only UCL or the FAL in this analysis apply equally to both.

[6] "[F]or a [UCL] lawsuit properly to be allowed to continue, standing must exist at all times until judgment is entered and not just on the date the complaint is filed." *Troyk*, 90 Cal. Rptr. 3d at 622 (citation and internal quotations omitted).

6

the year Meyer received Defendants' faxes, his business both sent and received "a number of faxes" every day using a single fax machine. (Defendants' Fact No. 6; Doc. No. 50-3 at 14.) Moreover, at deposition, Meyer withdrew any claim of actual damages related to transmission of the junk faxes. (Defendants' Fact No. 11; Doc. No. 53 at 19.)

The only evidence Meyer musters in response to this portion of Defendants' summary judgment motion is his own declaration. (*See* Doc. No. 63-2.) With respect to the economic injury issue, he therein declares that DCM Properties maintains a fax machine that operates in the following manner: "If someone uses a device to send a fax to our fax number it will transcribe text and/or images from a paper document to an electronic signal to be received by our fax machine which will then automatically print out a paper document copy of the fax. *This uses DCM Properties, Inc.'s ink and paper which we and not the sender must purchase to make the physical fax document.*" (Doc. No. 63-2 at 2 ¶ 5 (emphasis added).) Beyond this generic statement, Meyer provides no evidence— documents or lay or expert testimony—that in any manner establishes any measure of economic injury he sustained from receiving seven faxes. He merely avers that the faxes consumed an unknown quantity of ink and paper that his business had to purchase to operate the fax machine. He and DCM conclude that because they suffered a "loss of ink and paper," they have satisfied the economic loss requirement for UCL and FAL standing. (Doc. No. 63 at 5.)

It is plainly evident that Meyer is unable to establish that he suffered a cognizable, non-trivial economic injury under the UCL and FAL. Although ink and paper have *some* cost, Meyer provides nothing more than the generic assertion that "literally anybody living in America would have to know that ink and paper are economic commodities." (Doc. No. 63 at 5.) In relying on such generic assertions, Meyer misses the point, relies on "mere allegations," and provides no specific evidence from which the Court can conclude that he and DCM suffered anything beyond a trivial, *di minimis* loss.

To the contrary, Meyer's testimony actually establishes that DCM's loss *was* trivial and *di minimis*. For example, DCM received a total of seven faxes from Defendants in

2013 and 2014, and Meyer testified that DCM employees sent and received "a number" of faxes on a daily basis during that year.  Although "a number" of faxes per day is not numerically defined by either party, the ink and paper that seven junk faxes would consume during 2013 and 2014 would have been negligible.  Even conservatively assuming for the sake of argument that DCM sent and received only two faxes per day in 2013 and 2014, the resources that the 723 *non*-junk faxes would have consumed in those years would have dwarfed any negligible resources that Defendants' seven[7] junk faxes consumed.  Even under this conservative scenario, DCM's losses were *di minimis* and trivial.

Moreover, as in *Van Patten*, DCM paid a flat rate to Vonage and was not charged on a per-fax basis.  Thus, there is no evidence that DCM incurred any additional service provider charges when it received the seven junk faxes.

Plaintiffs seem to have recognized and admitted their inability to prove economic damages from the inception this case.  (*See, e.g.*, SAC ¶ 61 (stating, in the context of the TCPA claim, that "[*g*]*iven the nominal amount of actual damages*, Plaintiffs elect to pursue statutory damages . . . .") (emphasis added).)  Because Meyer and DCM have only nominal damages and have failed to meet their burden to establish quantifiable, non-trivial economic injury, they lack standing under the UCL and the Junk Fax Law.

### ii.   Arnie Katz, Venture Support Group LLC, and Ken Moser

Plaintiffs Arnie Katz, Venture, and Ken Moser are similarly situated in that they received junk faxes through computer-based fax services called "myfax.com" and "efax.com."  These services did not automatically print any of the faxes they received, and the faxes were instead digitally stored on their computers.[8]  (Defendants' Fact No. 17; Doc.

---

[7] Under this conservative scenario that favors Meyer, seven faxes account for less than 1% of all faxes Meyer would have sent and received in 2013 and 2014.  Of course, the reality is likely that DCM sent and received many more than only two faxes per day.

[8] Katz also had a traditional, physical fax machine and testified at deposition that this machine had not required repair.  (Defendants' Fact No. 26; Doc. No. 50-6 at 9.)

No. 50-5 at 9-10; *see* Doc. No. 63-3 at 2 ¶¶ 5-6.)  Both Katz and Moser saved the junk faxes and chose to voluntarily print the faxes at a later date.  (Doc. No. 50-5 at 11; Doc. No. 50-6 at 8-9.)  Katz was not charged for individual faxes and paid a flat rate fee to his service provider.  (Doc. No. 50-5 at 9.)

Additionally, like Meyer, Katz and Moser generally assert, without any evidence, that their economic loss—whatever the amount might be—encompasses the "use of ink and paper."  (Doc. No. 63 at 6.)  However, they provide no concrete evidence of economic injury to rebut Defendants' argument that they suffered no such injury.  They simply contend that ink and paper have some measure of economic value, and that is enough to satisfy the economic injury requirement under the UCL and FAL.  Applying the standard cited above, it is again plainly evident that Katz and Moser suffered nothing more than trivial, nominal, *di minimis* economic injury from the junk faxes they received.  They have not-so-tacitly admitted this since the inception of this case.  (SAC ¶ 61.)  And they now confirm as much given the complete dearth of evidence of quantifiable economic injury.

Finally, it not insignificant that Katz and Moser voluntarily printed the faxes that were electronically stored on their computers.  Katz and Moser thus voluntarily took affirmative steps to cause the consumption of ink and electricity—nothing Defendants did compelled Katz and Moser to print the digital faxes and incur damages, whether cognizable or not.  Thus, even if Katz, Moser, and Venture had quantifiable damages, they could not be properly traced or attributed to Defendants.  Defendants could not have caused such damages because they did not cause the faxes' printing.

Because Katz, Moser, and Venture have failed to meet their burden to establish that they suffered a quantifiable, non-trivial economic injury, they lack standing under the UCL and the Junk Fax Law.

### iii.   Conclusion

In sum, Defendants argue Plaintiffs had sustained no cognizable economic injury for UCL and FAL standing purposes.  In response, Plaintiffs provided no specific evidence of economic injury and failed to dispute Defendants' asserted facts.  Accordingly, Plaintiffs

have not sufficiently established for purposes of the summary judgment any injury in fact. *Cf. Troyk v. Farmers Grp., Inc.*, 90 Cal. Rptr. 3d 589, 624-25 (Cal. Ct. App. 2009) (denying Defendant's summary judgment motion challenging standing where Plaintiff presented sufficient evidence that he was charged an additional $5 per month).   Based on the foregoing, the Court lacks subject matter jurisdiction over Claims Two (Junk Fax Law) and Eight (UCL) because Plaintiffs lack standing.   Accordingly, Defendants' motion for summary judgment is GRANTED-IN-PART and judgment shall be entered in Defendants' favor on these claims.

### b.   Claim Seven:   Consumer Legal Remedies Act, Cal. Civil Code § 1770(a)(22)

In Claim Seven, Plaintiff Moser alleges Defendants violated California Civil Code § 1770(a)(22), which is a part of the Consumer Legal Remedies Act ("CLRA"), and which essentially requires that all unsolicited prerecorded telephone messages first be introduced by a live person who must ask for permission to play a recorded message.   Continuing the challenge to Plaintiffs' standing, Defendants contend Moser has not proven he suffered damages under the CLRA.[9]   However, there is a more fundamental reason why Moser lacks standing:   the CLRA simply does not apply to loan products in the first place.   Although neither party addressed whether the CLRA applies to the type of product marketed by the unsolicited faxes and telemarketing at issue in this case, the Court nonetheless has a duty to examine its jurisdiction *sua sponte*.   The Court does so now and finds that the CLRA does not apply to this case.

---

[9] For the first time in their *reply brief*, Defendants also argue Moser was not a "consumer" under the CLRA because he never intended to purchase the goods and services they were trying to market through their telemarketing calls.   If true, Moser lacks standing under the CLRA for this additional reason.   However, the entire focus of Defendants' MSJ was on their contention that Moser has no standing based on the lack of actual economic damages. Given the Court's finding that the CLRA does not apply in this case in the first place, the Court does not resolve whether Moser qualifies as a "consumer" under the CLRA.

As an initial matter, because the question of standing is a threshold jurisdictional issue, federal courts have a duty to examine their jurisdiction *sua sponte*. *See D'Lil v. Best W. Encina Lodge & Suites*, 538 F.3d 1031, 1035 (9th Cir. 2008); *United Investors Life Ins. Co. v. Waddell & Reed Inc.*, 360 F.3d 960, 967 (9th Cir. 2004) (stating that "the district court had a duty to establish subject matter jurisdiction . . . sua sponte, whether the parties raised the issue or not"). The Court may even dismiss a case for lack of subject matter jurisdiction without giving notice to the parties. *Scholastic Entm't, Inc. v. Fox Entm't Grp., Inc.*, 336 F.3d 982, 985 (9th Cir. 2003); *Franklin v. Oregon, State Welfare Div.*, 662 F.2d 1337, 1342 (9th Cir. 1981).

The CLRA applies to "transaction[s] intended to result or which result[] in the sale or lease of goods or services to [a] consumer . . . ." Cal. Civ. Code § 1770(a). The CLRA defines "goods" as "tangible chattels bought or leased for use primarily for personal, family, or household purposes," *id.* § 1761(a), and "services" as "work, labor, and services for other than a commercial or business use, including services furnished in connection with the sale or repair of goods," *id.* § 1761(b). For purposes of the CLRA, loans are neither goods nor services. *Alborzian v. JPMorgan Chase Bank, N.A.*, 185 Cal. Rptr. 3d 84, 93 (Cal. Ct. App. 2015) ("A mortgage loan is not a 'good' because it is not a 'tangible chattel'; it is not a 'service' because it is not 'work, labor, [or] services . . . furnished in connection with the sale or repair of goods.'"); *see also Fairbanks v. Superior Court*, 205 P.3d 201, 206 (Cal. 2009) ("[A]ncillary services that insurers provide [such as loans] to actual and prospective purchasers of life insurance do not bring the [insurance] policies within the coverage of the [CLRA]."); *Elstead v. JPMorgan Chase Bank*, Nos. A140069, A141247, 2017 Cal. App. Unpub. LEXIS 1567, at *51-52 (Mar. 3, 2017) (approvingly discussing *Alborzian* in dicta).

Federal district courts have also held that loans do not qualify as goods and services under the CLRA. *See, e.g.*, *Jamison v. Bank of Am., N.A.*, 194 F. Supp. 3d 1022, 1031-32 (E.D. Cal. 2016) ("[T]he court agrees with the California Court of Appeal decision in *Alborzian* and the majority of district court cases and concludes defendant's mortgage

services do not fall within the coverage of the CLRA."); *Consumer Solsutions Reo, LLC v. Hillery*, 658 F. Supp. 2d 1002, 1016-17 (N.D. Cal. 2009) (dismissing CLRA claim with prejudice because "loans are intangible goods and that ancillary services provided in the sale of intangible goods do not bring these goods within the coverage of the CLRA."); *Sapan v. Lexington Mortg. Corp.*, No. SACV 16-01718-JVS(DFMx), 2017 U.S. Dist. LEXIS 63069, at *5-6 (C.D. Cal. Apr. 17, 2017); *Kirkeby v. JP Morgan Chase Bank, N.A.*, No. 13-CV-377-WQH(MDD), 2014 U.S. Dist. LEXIS 174385, at *22-25 (S.D. Cal. Dec. 17, 2014) (holding loan modification programs, which are contractual obligations to pay money, are not goods or services within the meaning of the CLRA); *Sonoda v. Amerisave Mortg. Corp.*, No. C-11-1803-EMC, 2011 U.S. Dist. LEXIS 73940, at *5 (N.D. Cal. July 8, 2011) ("If a contractual obligation to pay money (under an insurance contract) is not a service, then neither is a contractual obligation to *lend* money.") (emphasis in original); *Reynoso v. Paul Fin., LLC*, No. 09-3225-SC, 2009 U.S. Dist. LEXIS 106555, at *28-29 (N.D. Cal. Nov. 16, 2009) (concluding the CLRA does not extend to "ancillary services" in connection with mortgage loans).

Here, there is no dispute that Defendants' telemarketing efforts concerned attempts to sell short-term business loans.  (Doc. No. 61-5 at 20-28, 32 (exhibits D, E, F, and H to Moser Declaration containing email communications Moser received from Capital Alliance in response to Moser's communications with Capital Alliance after he received telemarketing calls to his cellular telephone; all emails specifically mention short-term business loans); SAC, Doc. No. 1-1 at 30-85 (55 exhibits to Second Amended Complaint containing faxes offering short-term business loans).  Short-term business loans are not materially distinguishable from the mortgage loans at issue in *Alborzian*—at bottom, both are contractual obligations to lend money.  Moreover, the services Defendants provided to lenders are ancillary services that do not bring this case within the CLRA.  The Court agrees with the multitude of state and federal cases and finds the CLRA does not cover the subject matter of this case.

At oral argument, Plaintiffs attempted to distinguish this case by arguing that Defendants were not lenders and were not themselves in the business of making business loans—they merely served as loan advertisers.  They contend that because Defendants did not actually issue loans and simply provided marketing or advertising services for the loan originators, they provided services "related to" loans and thus fall outside the rule above. The Court is not persuaded.  In *Fairbanks v. Superior Court*, 205 P.3d 201 (Cal. 2009), the Supreme Court of California held that "the ancillary services that insurers provide to actual and prospective purchasers of life insurance do not bring the policies within the coverage of the CLRA."  205 P.3d at 206.  Since then, state and federal courts have followed *Fairbanks* and have consistently found that the CLRA does not cover ancillary services related to loans, and such services do not transform intangible goods and services into tangible goods and services that would otherwise not be covered by the CLRA.  *See, e.g.*, *Jamison v. Bank of Am., N.A.*, 194 F. Supp. 3d 1022 (E.D. Cal. 2016) (CLRA inapplicable to servicer of mortgage loan); *Gerbitz v. ING Bank*, 967 F. Supp. 2d 1072, 1080 (D. Del. 2013) (finding that California law "makes clear that . . . ancillary services, including maintenance or other customer services, do not transform an intangible service into a tangible good or service under the CLRA."); *Alborzian v. JPMorgan Chase Bank, N.A.*, 185 Cal. Rptr. 3d 84, 93 (Cal. Ct. App. 2015) (affirming the dismissal of a homeowner's CLRA claim alleged against one of its mortgage lenders *and* a debt collection agent of the lender); *Robles v. One W. Bank*, No. B234196, 2012 Cal. App. Unpub. LEXIS 7618, at *13-14 (Cal. Ct. App. Oct. 22, 2012) (explaining that the court in Fairbanks "held that 'ancillary services' provided by insurers—like those also provided by sellers of investment securities, bank deposit accounts, and loans—which include 'assist[ing] prospective customers in selecting products that suit their needs, and . . . provid[ing] additional customer services related to the maintenance, value, use, redemption, resale, or repayment,' do not fall under the CLRA.").

The Court finds these state and federal cases persuasive.  The CLRA defines "services" as "work, labor, and services for other than a commercial or business use,

including services furnished *in connection with the sale* or repair of *goods*." *Alborzian*, 185 Cal. Rptr. 3d at 93 (citing Cal. Civ. Code § 1761(b)) (emphasis added). For services "in connection with" the sale of goods to qualify under the CLRA, "goods" must themselves be covered by the CLRA. *See Gerbitz*, 967 F. Supp. 2d at 1080. Since loans at their core are not "goods" or "services" under the CLRA, advertising related to selling such intangible financial goods are not "services furnished in connection with" any goods or services. *See Consumer Solutions Reo, LLC v. Hillery*, 658 F. Supp. 2d 1002, 1016-17 (N.D. Cal. 2009) ("*Fairbanks* . . . indicates that loans are intangible goods and that ancillary services provided in the sale of intangible goods do not bring these goods within the coverage of the CLRA."). It would seem wildly incongruous that the CLRA would apply to advertising or marketing of loans but not apply to the loans themselves. Indeed, bootstrapping the CLRA into this case in this manner would, as the Supreme Court of California explained, "defeat the apparent legislative intent in limiting the definition of" goods and services, *Fairbanks*, 205 P.3d at 202; *see also Gerbitz*, 967 F. Supp. 2d at 1080, by greatly expanding that definition.

The Court finds that Defendants' advertising or marketing of loans is an ancillary service that does not fall within the CLRA. Accordingly, Moser lacks standing under the CLRA, and Defendants are entitled to summary judgment on Claim Seven.[10]

### 3. Claims Nine (Trespass) and Ten (Conversion)

Defendants seek summary judgment on the ninth claim (trespass) and tenth claim (conversion) on the basis that Plaintiffs suffered no actual harm from Defendants' faxes or telemarketing calls. (Doc. No. 50 at 16-18.) Plaintiffs respond that they suffered harm in the form of the "tying up" of telephone lines and the use of Plaintiffs' "physical and

---

[10] Given the Court's findings above, the Court need not resolve whether the CLRA requires actual economic damages or whether any damages satisfy CLRA standing. (*See* Doc. No. 50 at 15.) In light of the Court's grant of summary judgment, the portion of the motion to dismiss the CLRA claim is DENIED as moot.

electronic" resources.  (Doc. No. 63 at 8.)  Such nebulous "damages" are not sufficient for trespass and conversion claims under California law.

"Under California law, trespass to chattels lies where an intentional interference with the possession of personal property *has proximately caused injury*.  In cases of interference with possession of personal property not amounting to conversion, the owner has a cause of action for trespass or case, and *may recover only the actual damages suffered by reason of the impairment of the property or the loss of its use*."  *Intel Corp. v. Hamidi*, 71 P.3d 296, 302 (Cal. 2003) (internal quotations and citation omitted) (emphasis in original).  To allege a plausible claim for trespass to a computer system or similar device, California law requires that plaintiffs plead with factual particularity that the purported trespass: (1) caused physical damage to the personal property, (2) impaired the condition, quality, or value of the personal property, or (3) deprived plaintiff of the use of personal property for a substantial time.  *Id.* at 306.  The Supreme Court of California has emphasized that:

> [U]nder California law the tort [of trespass] does not encompass, *and should not be extended to encompass*, an electronic communication that neither damages the recipient computer system nor impairs its functioning.  Such an electronic communication does not constitute an actionable trespass to personal property, i.e., the computer system, because it does not interfere with the possessor's use or possession of, or any other legally protected interest in, the personal property itself.

*Id.* at 300 (emphasis added).

In *Hamidi*, a computer company brought an action against a former employee and sought an injunction to prevent him from sending e-mails to the company's employees. The employee had used Intel's internal internet-connected e-mail system to send e-mails to between 8,000 and 35,000 employees on six occasions, and he refused to stop when Intel requested that he do so.  *Id.*  The trial court granted summary judgment for Intel and issued a permanent injunction on a theory of trespass to chattels.  *Id.* at 301-02.  The appellate court affirmed, but the Supreme Court of California reversed on the grounds that the tort of trespass to chattels did not encompass, and should not be extended to encompass, electronic intrusions that neither damaged nor impaired the functioning of Intel's computer

system.  *Id.* at 300, 304.  In doing so, the court rejected the argument that the mere "unauthorized use of another chattel is actionable even without any showing of injury." *Id.* at 306.  In the context of cognizable injury, the court then explained that "*[a] mere momentary or theoretical deprivation of use is not sufficient* unless there is a dispossession . . . ." *Id.* (internal quotations and citation omitted; emphasis added).  Thus, the Court held that in the absence of any actual damage or dispossession, a cause of action for trespass to chattels will not lie.  *Id.* at 308, 311.

Cases where viable electronic intrusion-based trespass claims lay have involved more than the trifling interference with phone and fax lines evident in the instant case.  *See, e.g.*, *Thrifty-Tel, Inc. v. Bezenek*, 54 Cal. Rptr. 2d 468, 471 (Cal. Ct. App. 1996) (finding trespass claim actionable where the defendant's automated dialing system "*overburdened the system*, denying some subscribers access to phones lines") (emphasis added); *In re Lenovo Adware Litig.*, No. 15-MD-2624-RMW, 2016 U.S. Dist. LEXIS 149958, at *35 (N.D. Cal. Oct. 27, 2016) (denying motion to dismiss where "Plaintiffs allege[d] that consumers complained that [software installed on computers] 'interfered with watching videos online, caused the computers to run slow, blocked or slowed connections to certain websites, and caused security issues.'"); *see also Sch. of Visual Arts v. Kuprewicz*, 771 N.Y.S.2d 804, 808 (N.Y. Sup. Ct. 2003) (finding sufficient plaintiffs' allegations that "large volumes" of unsolicited job applications and pornographic e-mails "depleted hard disk space, drained processing power, and adversely affected other system resources on SVA's computer system").

Consistent with the reasoning in *Hamidi*, courts have rejected trespass claims where the alleged injury was trifling and did not materially interfere with the computer system or resources.  *See, e.g.*, *In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1069 (N.D. Cal. 2012) (dismissing complaint with prejudice where alleged harm included consumption of bandwidth, storage space, memory and finding that "[w]hile these allegations conceivably constitute a harm, they do not plausibly establish a significant reduction in service constituting an interference with the intended functioning of the system, which is

necessary to establish a cause of action for trespass."); *Fields v. Wise Media, LLC*, No. C12-05160-WHA, 2013 U.S. Dist. LEXIS 136914, at *13 (N.D. Cal. Sep. 24, 2013) (dismissing complaint with prejudice and rejecting argument that the "defendants' interference with plaintiffs' phones by sending unsolicited text messages directly affects a 'legally protected interest' of plaintiffs, even if their phones are not physically damaged."); *see also Fields*, 2013 U.S. Dist. LEXIS 136914, at *14-15 ("Allowing plaintiffs to assert a claim for trespass to chattels absent actual physical harm or impairment to their phones would vastly expand tort law and this order will not do so absent binding Ninth Circuit authority.  This order denies plaintiffs leave to add trespass to chattels as a claim for relief based on the plain reading of *Hamidi*.").

Here, Plaintiffs' trespass claim is precisely the type of momentary, injury-lacking intrusion described in *Hamidi*.  Beyond bare assertions that "the illegal facsimiles and calls tied up the phone lines and used the physical and electronic resources of Plaintiffs," (*see* Doc. No. 63 at 8), Plaintiffs have presented no competent evidence of meaningful interference with—or any dispossession of—their computers, telephone lines, or fax lines. Besides the general assertion that their telephone and fax lines were "tied up," they present no evidence of any measureable damage or impairment of functioning.  Rather, the only evidence before the Court establishes that Plaintiffs sustained nothing more than momentary intrusions.

Additionally, Plaintiffs have not—and cannot—establish the cost of their alleged losses.  First, had they had any such evidence, they surely would have presented it at this summary judgment phase.  And second, Plaintiffs all testified in depositions that they could not quantify the amount of their losses.  Such trifling intrusions are patently insufficient and plainly not actionable under California law.  *See Hamidi*, 71 P.3d at 306.  Accordingly, because the only evidence before the Court establishes nothing more than a momentary intrusion upon Plaintiffs, their trespass claim fails.  *Accord id.* at 306-07 ("That Hamidi's messages temporarily used some portion of the Intel computers' processors or storage

is, . . . not enough; Intel must, but does not, demonstrate some measurable loss from the use of its computer system.")

However, even if Plaintiffs had been able to quantify the amount of their losses, those amounts would nonetheless have been nominal given the small number of telephone calls and faxes they received. Indeed, Plaintiffs themselves acknowledge that they suffered nothing more than nominal damages. (SAC, Doc. No. 1-1 at ¶¶ 40, 61 ("*Given the nominal amount of actual damages*, Plaintiffs elect to pursue statutory damages . . . .") (emphasis added).) The trespass claim would nonetheless fail for the simple and undisputed fact that Plaintiffs suffered nothing more than nominal damages, if any at all. *See Omega World Travel, Inc. v. Mummagraphics, Inc.*, 469 F.3d 348, 359 (4th Cir. 2006) ("[T]he courts that recognize trespass to chattels based upon computer intrusions *do not allow 'an action for nominal damages* for harmless intermeddlings with the chattel.'") (citing *Hamidi*, 71 P.3d at 302) (emphasis added).

Plaintiffs' reliance on *Thrifty-Tel* is misplaced because that case involved a far greater intrusion upon telephone lines than Plaintiffs experienced. There, the defendants essentially hacked Thrifty-Tel's telephone lines, used software to perform "rapid-fire random number searches" four hours on end, made *thousands* of long-distance telephone calls, and "[b]ecause Thrifty-Tel is a small carrier with relatively few telephone lines, [the defendant's] automated calling overburdened the system, denying some subscribers access to phones lines." *Thrifty-Tel, Inc.*, 54 Cal. Rptr. 2d at 471-72. The California Court of Appeal held that the trespass claim survived under these aggravated circumstances that demonstrated substantial interference with, occupation, and use of Thrifty-Tel's resources. Here, however, the totality of the evidence Plaintiffs muster is that their fax and telephone lines were momentarily "tied up" on a trivial number of occasions[11] and fail to present any

---

[11] Defendants Meyer and DCM Properties collectively received seven faxes and no telemarketing calls. (Doc. No. 63-2 at ¶ 6.) Defendant Moser received six faxes and four telemarketing calls. (Doc. No. 63-3 at ¶¶ 67, 11, 14, 15-16.) Defendant Katz received 41

evidence of any real harm they suffered as a result.[12]  This case is therefore a far cry from *Thrifty-Tel*, which does not support Plaintiffs' analysis-lacking assertions claiming otherwise.

As for Claim Ten for conversion, under California law, Plaintiffs must prove an "ownership or right to possession of the property at the time of the conversion, the defendant's conversion by a wrongful act or disposition of property rights, and resulting damages." *Avidor v. Sutter's Place, Inc.*, 151 Cal. Rptr. 3d 804, 814 (Cal. Ct. App. 2013). Conversion requires a higher showing than trespass, which has been dubbed the "little brother of conversion." *Hamidi*, 71 P.3d at 302 ("[T]he tort of trespass to chattels allows recovery for interferences with possession of personal property 'not sufficiently important to be classed as conversion.'"); *Plotnik v. Meihaus*, 146 Cal. Rptr. 3d 585, 600 (Cal. Ct. App. 2012) ("Trespass to personal property often arises in circumstances where a defendant's interference with another's property falls short of that required for a conversion cause of action."); *Thrifty-Tel, Inc.*, 54 Cal. Rptr. 2d at 473.  Because conversion claims require a higher showing, it follows that plaintiffs who cannot meet the lower trespass threshold will not be able to meet the higher conversion threshold.

_____

faxes and no telemarketing calls.  (Doc. No. 63-4 at ¶ 14.)  Even Katz's 41 faxes pale in comparison to the thousands of calls the *Thrifty-Tel* defendants made using far more intrusive methods that essentially hijacked the company's telephone lines.  Indeed, the *Thrify-Tel* defendants' conduct was far more egregious, as it involved the intrusion into the company's computer systems and intrusive, rapid-fire searches using outside software that overburdened the systems for hours.

[12] Any ink, paper, and electricity costs Katz and Moser incurred from printing the faxes are not attributable to Defendants.  They admit that their computers did not automatically print the faxes and instead stored all of them digitally.  Any costs related to printing the faxes were incurred by Katz and Moser's own affirmative actions and cannot be compared to *Thrifty-Tel*.  Plaintiffs imposed the costs *upon themselves*.  It utterly strains credulity to attribute any such costs to Defendants when Katz and Moser themselves chose to print digital faxes stored on their computers.

Defendants are entitled to summary judgment on both the trespass (claim 9) and conversion claims (claim ten).

### 4. Claim Eleven (Civil Conspiracy)

In light of the Court's finding below dismissing Claim Eleven with prejudice, this portion of Defendants' summary judgment motion is DENIED as moot.

## B. Plaintiffs' Motion for Partial Summary Judgment (Doc. No. 61)

### 1. Claims One (Junk Faxes, 47 U.S.C. § 227(b)(1)(C)) and Three (Telemarketing Calls, 47 U.S.C. § (b)(1)(B))

In Claim One, Plaintiffs Meyer, Katz, and DCM Properties allege they received junk faxes in violation of 47 U.S.C. § 227(b)(1)(C). In Claim Three, Plaintiff Moser further alleges he received pre-recorded telemarketing calls on his home telephone on at least four occasions in violation of 47 U.S.C. § (b)(1)(B). Because a genuine dispute of material fact exists as to Defendants' third-party liability, Plaintiffs' motion for summary judgment on these claims is DENIED.

As an initial matter, "[u]nder the TCPA's implementing regulations, a fax 'sender' is defined as 'the person or entity *on whose behalf* a facsimile unsolicited advertisement is sent or whose goods or services are advertised or promoted in the unsolicited advertisement.'" *Bee, Denning, Inc. v. Capital All. Grp.*, 310 F.R.D. 614, 620 n.2 (S.D. Cal. 2015) (quoting 47 C.F.R. § 64.1200(f)(10)) (emphasis in original). "Thus, under this definition, a company can 'send' an unsolicited fax advertisement without directly participating in the physical transmission of such a fax." *Id.* Accordingly, Defendants are incorrect that they cannot be held liable because they did not personally send faxes or make telemarketing calls.

As for both Claims One and Three, the question is whether Defendants can be held liable for the fax transmissions or telemarketing calls of third-party vendors. This analysis requires Plaintiffs to prove there is an agency relationship between Capital Alliance and Absolute Fax for Claim One and Capital Alliance and Message Communications for Claim Three. If there is no legal agency relationship, then Message Communications and

Absolute Fax are independent contractors under the law and Defendants cannot be held liable.

There are three different agency theories of liability under California law: actual authority, apparent authority, and ratification. *Id.* at n.3; *see also Henderson v. United Student Aid Funds, Inc.*, No. 13-CV-1845-JLS(BLM), 2017 U.S. Dist. LEXIS 28165, at *19 (S.D. Cal. Feb. 27, 2017) (discuss all three agency theories in the context of the TCPA; granting defendants' summary judgment motion).

Under the "classical" or actual authority theory of agency, "'[t]o form an agency relationship, both the principal and the agent must manifest assent to the principal's right to control the agent." *Henderson*, 2017 U.S. Dist. LEXIS 28165, at *16 (quoting *United States v. Bonds*, 608 F.3d 495, 506 (9th Cir. 2010)). "This in turn implicates 'the degree of control exercised by the principal over the activities of the agent.'" *Id.* (quoting *In re Coupon Clearing Serv., Inc.*, 113 F.3d 1091, 1099 (9th Cir. 1997)). "Agency is not established when 'control may be exercised only as to the result of the work and not the means by which it is accomplished[;]' in such a case "an independent contractor relationship exists.'" *Id.* (same).

Here, as to Claim One, Plaintiffs proffer that the evidence establishes that "Capital Alliance, though its CEO, Mr. Charanvattanakit, admits it hired a company called Absolute Fax to send fax ads on its behalf. Mr. Charanvattanakit agrees that he knew Absolute Fax would send fax advertisements for Capital Alliance Group. [He] admits Capital Alliance Group paid Absolute Fax to send the fax ads. [He] admits that Absolute Fax sent these fax ads. He also admits that he did not discuss TCPA compliance with Absolute Fax." (Doc. No. 61-1 at 9.) As to Claim Three, Plaintiffs proffer that the evidence establishes that "Capital Alliance, though its CEO, Mr. Charanvattanakit, admits it hired a company called Message Communications to make calls on its behalf. [He] agrees that he knew Message Communications would make prerecorded phone calls for Capital Alliance. [He] admits Capital Alliance paid Message Communications to make the calls. [He] admits that Message Communications made these calls." (Doc. No. 61-1 at 14-15.)

Even accepting all of the above as true, Plaintiffs have nonetheless failed to establish actual authority agency as a matter of law.[13]   Plaintiffs have at most established Capital Alliance's control over the *result* of the work—not over the means by which it was accomplished.  In other words, Plaintiffs have only established Defendants' hiring of third-party vendors to accomplish the ultimate goal of sending faxes and making telemarketing calls, but they have not established the requisite control over the methods and means the companies employed to accomplish these tasks.  Plaintiffs inadvertently signal this lack of oversight and control when they argue that Capital Alliance "did not express to Message Communications any requirement of TCPA-compliance in transmitting its calls."  (Doc. No. 61 at 16.)  At this juncture, Plaintiffs have not shown as a matter of law that an actual authority agency relationship existed such that Capital Alliance is liable for the faxes Plaintiffs received and the telemarketing calls Moser received.

Next, "[a]pparent authority is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." *Makaron v. GE Sec. Mfg.*, No. CV-14-1274-GW(AGRx), 2015 U.S. Dist. LEXIS 75240, at *20-21 (C.D. Cal. May 18, 2015) (internal quotations and citation omitted).  Apparent authority "cannot be established merely by showing that [the alleged agent] claimed authority or purported to exercise it."  *NLRB v. Dist. Council of Iron Workers of Cal. & Vicinity*, 124 F.3d 1094, 1099 (9th Cir.1997).  Rather, it is only established "by proof of something said or done by the [alleged principal], on which [the plaintiff] reasonably relied."  *Id.*  "The principal's manifestations giving rise to apparent authority may consist of direct statements to the third person, directions to the agent to tell something to the third person, or the granting of permission to the agent to perform acts . . .

---

[13] Defendants' objections to the expert report of Jeffrey Hansen are moot.  Even accepting, for the sake of argument, all of Plaintiffs' proffered evidence, including Hansen's report, jury questions still remain.

under circumstances which create in him a reputation of authority. . . .” *Mavrix Photographs, Ltd. Liab. Co. v. LiveJournal, Inc.*, No. 14-56596, 2017 U.S. App. LEXIS 16624, at *18-19 (9th Cir. Apr. 7, 2017) (amended opinion) (quoting *Hawaiian Paradise Park Corp. v. Friendly Broad. Co.*, 414 F.2d 750, 756 (9th Cir. 1969)).

Here, there is currently insufficient evidence for the Court to conclude that apparent authority agency exists as a matter of law.  Plaintiffs argue that consumers who called the numbers listed on faxes pressed buttons, reached Capital Alliance, and had “no choice other than to believe Message Communications was acting on behalf of Capital Alliance Group since the third party would never even know during the call that anybody other than Capital Alliance Group was on the line.” (Doc. 61 at 17.)  But they cite no cases that support this argument.  While there could be sufficient evidence for a jury to find Message Communications and Absolute Fax had apparent authority, there is insufficient evidence for the Court to so conclude as a matter of law.  In sum, reasonable minds could differ, and Plaintiffs have not produced sufficient evidence.  A triable issue of fact exists as to whether Defendants are liable for TCPA violations under the apparent authority theory of vicarious liability.

Finally, under the ratification theory of agency, “[a]lthough a principal is liable when it ratifies an originally unauthorized tort, the principal-agent relationship is still a requisite, and ratification can have no meaning without it.”  *Batzel v. Smith*, 333 F.3d 1018, 1036 (9th Cir. 2003); *see also Henderson*, 2017 U.S. Dist. LEXIS 28165, at *23-24. Accordingly, the Court necessarily denies this portion of the MSJ as well because it is dependent on the existence of actual or apparent authority agency.

### 2.     Claims Two, Three, and Six

Plaintiffs seeks entry of judgment in their favor on Claims Two, Three, and Six. However, in light of the Court’s rulings on these claims in Defendants’ favor elsewhere in this Order, these portions of Plaintiffs’ motion are DENIED as moot.

1
2
3

### 4. Personal Liability of Narin Charanvattanakit and Mark Mendoza; Statutory Damages; and Entitlement to "Willful" or "Knowing" Trebled Damages

The TCPA imposes personal liability on companies' directors and officers who direct, authorize, or ratify violations of the TCPA.  Plaintiffs seek summary judgment on the personal liability of Mark Mendoza and Narin Charanvattanakit, Capital Alliance's principals.  However, because the Court has found Plaintiffs have not established a TCPA violation in the first place and thus denied their MSJ on Claims One and Three, this portion of the motion is also DENIED.  Additionally, Plaintiffs' motion as to their entitlement of statutory damages is DENIED for the same reason.  Finally, the motion as to whether Defendants wilfully or knowingly violated the TCPA is DENIED for the same reason.  The fundamental determination that the TCPA has been violated must precede each of these inquiries, which cannot logically follow if there has been no TCPA violation in the first place.

### C. Defendants' Motion to Dismiss (Doc. Nos. 48, 49)

Defendants' motion to dismiss is based on (1) the lack of subject matter jurisdiction based on lack of standing and (2) failure to state a claim under Rule 12(b)(6).  As a result of the rulings above on Defendants' MSJ, five portions of the motion to dismiss are moot.  The Court GRANTS the motion in part and dismisses Claims Four, Five, Six, and Eleven with prejudice.  The motion with respect to Claims One and Three is DENIED.

### 1. Claim One:  Telephone Consumer Protection Act, 47 U.S.C. §§ 227 *et al.*

Defendants contend Plaintiffs lack standing to bring the TCPA Claim One.  (Doc. No. 48 at 11-15.)  As an initial matter, the Court finds this portion of the motion is timely, as it is a challenge to the Court's jurisdiction.  However, Plaintiffs have properly alleged Article III standing, and the Court has jurisdiction over the TCPA claim as a result.

#### a. Timeliness of the Motion to Dismiss

Under Article III § 2 of the Constitution, this Court's subject matter jurisdiction is limited to deciding "cases" or "controversies."  *See, e.g.*, *Allen v. Wright*, 468 U.S. 737,

750 (1984).  No case or controversy exists if a plaintiff lacks standing or if a case is not ripe for adjudication, *see, e.g.*, *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 1999) (en banc), and consequently a federal court lacks subject matter jurisdiction.  *See, e.g.*, *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000) (reiterating that "standing . . . pertain[s] to a federal court's subject-matter jurisdiction under Article III"); *St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir. 1989) ("Whether a claim is ripe for adjudication goes to a court's subject matter jurisdiction under the case or controversy clause of article III of the federal Constitution.").

Plaintiffs object that FRCP 12(g) prohibits Defendants from filing this motion to dismiss in its entirety because they failed to raise the jurisdictional challenge in their initial motion to dismiss.  However, lack of subject matter jurisdiction may be raised by any party at any time, and it is never waived.  *See United States v. Cotton*, 535 U.S. 625, 630 (2002).  Thus, an exception to FRCP 12(g) applies here and permits Defendants to challenge the Court's jurisdiction based on Plaintiffs' lack of standing.  *See* FRCP 12(h)(3) ("If the court determines *at any time* that it lacks subject-matter jurisdiction, the court must dismiss the action.") (emphasis added).  Accordingly, the motion to dismiss is timely.

### b.     Plaintiffs Properly Allege Article III Standing for TCPA Purposes

In the context of the TCPA, unsolicited fax messages, like unsolicited telemarketing phone calls or text messages, violate the consumer's privacy and disturb their solicitude. *See Van Patten v. Vertical Fitness Grp., Ltd. Liab. Co.*, 847 F.3d 1037, 1043 (9th Cir. 2017).  For TCPA purposes, these injuries are sufficient to confer Article III standing, and Plaintiffs need not allege any additional harm.  *Id.*; *accord Gibbs v. SolarCity Corp.*, 239 F. Supp. 3d 391 (D. Mass. 2017) (collecting cases); *Flores v. Access Ins. Co.*, No. 15-CV-2883-CAS(AGRx), 2017 U.S. Dist. LEXIS 36486, at *11-12 (C.D. Cal. Mar. 13, 2017) (rejecting economic harm argument); *see also Palm Beach Golf Ctr.-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245, 1252-53 (11th Cir. 2015) (holding that occupation of fax machine during junk fax transmission on its own sufficiently confers Article III

standing); *Cordoba v. DIRECTV, LLC*, No. 15-CV-3755-MHC, 2017 U.S. Dist. LEXIS 125486, at *25-27 (N.D. Ga. July 12, 2017) (same; collecting cases).

Here, Plaintiffs allege Defendants violated the TCPA by sending each of them unsolicited fax messages without their consent and without a pre-existing business relationship. (SAC ¶¶ 34-36.) Under the line of cases above, these allegations alone are sufficient to confer Article III standing on Plaintiffs, and they need not allege anything further.

Defendants primarily argue that Plaintiffs cannot "claim actual harm" in this case because each of the faxes contained a telephone number or website address where the recipient can ask to opt out. But this argument is misleading because it relies on what is essentially a defense to a TCPA claim that is jury-rigged into a standing argument. They cite *ARcare v. Qiagen N. Am. Holdings, Inc.*, No. CV-16-7638-PA(ASx), 2017 U.S. Dist. LEXIS 8344 (C.D. Cal. Jan. 19, 2017), and argue that faxes that contain opt-out notices render Plaintiffs "unable to show that their injuries are traceable or related to [Defendants'] alleged violations of the TCPA." (Doc. No. 48 at 15.) *ARcare* followed this same line of reasoning that Defendants now advance. However, *ARcare* is not persuasive for two reasons.

First, *ARcare* is an unpublished district court case that pre-dated *Van Patten*—a binding, published opinion by the Ninth Circuit, which requires nothing more than the transmission of an unsolicited fax to confer Article III standing. The Court declines to follow *ARcare* over *Van Patten*. So long as Plaintiffs allege they received unsolicited faxes, which they have done here, they have satisfied the standing pleading requirement and need not allege more.

Second, *ARcare* has been criticized as imposing "a heightened causation requirement that is not supported by case law on standing." *Horton v. Sw. Med. Consulting, LLC*, No. 17-CV-266-CVE-mjx, 2017 U.S. Dist. LEXIS 105663, at *13 (N.D. Okla. July 10, 2017); *see also Gorss Motels, Inc. v. Sysco Guest Supply*, LLC, 2017 U.S. Dist. LEXIS 133488, at *19-20 (D. Conn. Aug. 21, 2017) (criticizing *ARcare*; concurring with *Horton*);

*Cordoba*, 2017 U.S. Dist. LEXIS 125486, at *25-27 ("[A]n overwhelming majority of courts . . . have continued to hold that the mere receipt of faxes, telemarketing calls, and/or text messages in violation of the TCPA constitutes sufficient harm for purposes of Article III standing") (collecting cases; identifying *ARcare* as an outlier).

Based on the foregoing, Defendants' motion to dismiss Claim One based on the lack of Article III standing is DENIED.[14]

### 2.   Claims Two, Seven, Eight, Nine, and Ten

Defendants move to dismiss Claims Two, Seven Eight, Nine, and Ten.  However, given that the Court has found they are entitled to summary judgment, the motion to dismiss these claims is DENIED as moot.

### 3.   Claim Three (TCPA, 47 U.S.C. § 227(b)(1)(B))[15]

Defendants contend Claim Three must be dismissed because Plaintiff Moser failed to provide "well pleaded factual allegations" with respect to the Claim's second element, which alleges Defendants used an automatic telephone dialing system in violation of 47 U.S.C. § 227(b)(1)(B).  (Doc. No. 48 at 17.)  Specifically, Moser alleges, "on information and belief . . . that Defendants made many more calls to his telephone lines by prerecorded voice message containing [a prerecorded voice to deliver a message]."  (SAC, Doc. No. 1

_____

[14] Because *ARcare* is inapposite here, Defendants' request for judicial notice (Doc. No. 49) of the telephone numbers contained in the faxes attached to the Second Amended Complaint is DENIED as moot.

[15] Although the motion to dismiss this claim is procedurally untimely under Federal Rule of Civil Procedure 12(g)(2), the Ninth Circuit recently joined two other Circuit Courts of Appeals in "forgiving of a district court's ruling on the merits of a late-filed Rule 12(b)(6) motion."  *In re Apple iPhone Antitrust Litig.*, 846 F.3d 313, 319 (9th Cir. 2017).  In doing so, the Court read section 12(g)(2) in conjunction with Rule 1 and concluded that "[d]enying late-filed Rule 12(b)(6) motions and relegating defendants to the three procedural avenues specified in Rule 12(h)(2) can produce unnecessary and costly delays, contrary to the direction of Rule 1."  *Id.* at 318.  Accordingly, with this guidance in mind, Plaintiffs' objections to the timeliness of the motion in this regard are OVERRULED, and the Court proceeds to the merits of this otherwise untimely portion of the motion to dismiss.

¶ 71.)  Defendants take issue that these allegations were made "on information and belief." However, in the preceding paragraph of the Second Amended Complaint, Moser alleges: "Defendants . . . called Plaintiff MOSER'S residential telephone line, using a prerecorded voice to deliver a message, without Plaintiff MOSER'S express permission at least four (4) times within the last 4 years, the statutory period established by 28 U.S.C. § 1658.  Plaintiff received the calls on 8/6/13, 8/29/13, 11/15/13, and 11/26/13."  (*Id.* ¶ 70.)  Ignoring these specific factual allegations, Defendants contend Claim Three contains "nothing more than a formulaic recitation of the second element . . . ."  (Doc. No. 48 at 17.)  However, even assuming, without deciding, Defendants are correct that the allegations in paragraph 71 are insufficient, Claim Three remains viably well-pled based on the specific allegations in paragraph 70.  The latter paragraph contains specific facts and dates, complies with pleading requirements, and is not a mere formulaic recitation of elements.  Accordingly, Defendants' motion to dismiss Claim Three is DENIED.

### 4.   Claims Four (47 C.F.R. § 64.1200(b)(1)); Five (47 C.F.R. § 64.1200(b)(2)); and Six (47 C.F.R. § 64.1601(e))

Next, Defendants contend Plaintiffs lack standing to bring the fourth, fifth, and sixth claims because the relevant subsections of 47 C.F.R. § 64.1200 and 47 C.F.R. § 64.1601(e) do not provide for a private right of action.  As an initial matter, the Court finds this portion of the motion to dismiss is timely given that it is a challenge to the Court's jurisdiction.  As for the merits, the Court finds none of the regulations in these claims confer a private right of action upon Plaintiffs.

### a.   Timeliness

As discussed above, standing bears on jurisdiction, and the Court can examine its jurisdiction at any time.  Plaintiffs have standing to bring suit provided they satisfy constitutional and prudential requirements.  *Nuclear Info. and Res. Serv. v. Nuclear Regulatory Comm'n*, 457 F.3d 941, 950 (9th Cir. 2006).  To meet the constitutional requirements for standing, a plaintiff must demonstrate it has "suffered an injury in fact," "the injury is fairly traceable to the challenged action," and "it is likely . . . that the injury

1  will be redressed by a favorable decision." *Id.* (quoting *Friends of the Earth, Inc. v.*

2  *Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-81 (2000)). To satisfy the prudential

3  standing requirements, a plaintiff must have "been granted a right to sue by the statute."

4  *Id.* Thus, whether a statute grants a private right of action bears on a plaintiff's standing

5  and thus the Court's jurisdiction. *See id.* Accordingly, the motion to dismiss is timely

6  under Rules 12(g)(2) and 12(h)(3).

7  **b.   Claims Four and Five are Dismissed**

8  The FCC's TCPA-implementing regulations in 47 C.F.R. § 64.1200(b) require all

9  prerecorded messages to state the identity of the entity responsible for the call at the

10  beginning of the call and provide a contact number during the message for that entity.

11  Defendants contend this regulation does not create a private right of action and accordingly

12  seek dismissal of Claims Four and Five. Defendants are correct.

13  Only two provisions of the TCPA expressly create private rights of action. 27 U.S.C.

14  §§ 227(b)(3), 227(c)(5). However, the regulations in section 64.1200(b) "flow directly

15  from the directives in Section 227(d)(3)." *Hurley v. Wayne Cty. Bd. of Educ.*, No. 3:16-

16  9949, 2017 U.S. Dist. LEXIS 86345, at *10 (S.D. W. Va. June 6, 2017); *see also Lynn v.*

17  *Monarch Recovery Mgmt.*, 953 F. Supp. 2d 612, 620 n.26 (D. Md. 2013). Section 227(d),

18  unlike sections 227(b) and 227(c), does not contain a provision that creates a private right

19  of action. *Charvat v. NMP, LLC*, 656 F.3d 440, 449 (6th Cir. 2011) ("Technical and

20  procedural standards specific to automated calls are included in § 227(d) and

21  accompanying regulation 47 C.F.R. § 64.1200(b), which do not provide a private right of

22  action or a statutory-damages provision."); *Boydston v. Asset Acceptance LLC*, 496 F.

23  Supp. 2d 1101, 1106 (N.D. Cal. 2007) ("In contrast to section 227(b)(3), the TCPA does

24  not provide a private right of action for violations of the technical and procedural standards

25  imposed by section 227(d)."); *Hurley*, 2017 U.S. Dist. LEXIS 86345, at *10; *Gulden v.*

26  *Consol. World Travel Inc.*, No. CV-16-1113-PHX-DJH, 2017 U.S. Dist. LEXIS 23350, at

27  *7-8 (D. Ariz. Feb. 15, 2017).

28

Based on the foregoing, the Court "is compelled to find that Congress did not intend private parties to enforce either section [227(d)] or the regulations prescribed pursuant to that section," and "is unwilling to read a private cause of action into section [227(d)] and its attendant regulations where Congress conspicuously omitted it but explicitly included it in adjacent subsections." *Hurley*, 2017 U.S. Dist. LEXIS 86345, at *10. Accordingly Claims Four and Five are DISMISSED with prejudice.

### c.   Claim Six is Dismissed

Defendants contend Plaintiffs lack standing to bring Claim Six because 47 C.F.R. § 64.1601(e) does not convey a private right of action. Plaintiffs recognize this lack of an express grant of a private right of action but nonetheless invite the Court to imply such a right when the statute and regulations have not expressly granted one. However, the Court finds section 64.1601(e) does not create a private right of action. In so finding, the Court is generally guided by the United States Supreme Court's jurisprudence on statutory construction in the private right of action context and finds persuasive the only case in the country to address this issue.

Where a statutory scheme and its implementing regulations have expressly created a private right of action but have not expressly done so elsewhere in the same scheme, it is "highly improbable" that Congress—or here, the FCC—"absent mindedly forgot to mention an intended private action." *Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 20 (1979) (internal quotation and citation omitted); *see also Cannon v. Univ. of Chi.*, 441 U. S. 677, 717 (1979) (stating that where Congress "intends private litigants to have a cause of action," the "far better course" is for Congress to confer that remedy in explicit terms). If the statute itself does not "displa[y] an intent" to create "a private remedy," then "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." *Alexander v. Sandoval*, 532 U.S. 275, 286-87 (2001); *see also Transamerica Mortg. Advisors, Inc.*, 444 U. S. at 15-16. The Supreme Court has held that the judicial task is instead "limited solely to determining whether Congress intended to create the private right

of action asserted." *Touche Ross & Co. v. Redington*, 442 U. S. 560, 568 (1979).  "If the statute does not itself so provide, a private cause of action will not be created through judicial mandate." *Ziglar v. Abbasi*, 582 U.S. ___, 137 S. Ct. 1843, 1855-56 (2017).  The Court keeps these principles in mind as it considers below the only case in the country to address whether section 64.1601(e) creates a private right of action

The District of Maryland in *Worsham v. Travel Options, Inc.*, No. JKB-14-2749, 2016 U.S. Dist. LEXIS 118774, 2016 WL 4592373 (D. Md. Sept. 2, 2016), noted uncertainty about where in the TCPA scheme section 64.1601(e) fits:

> In recognition of the role played by Caller ID in helping consumers avoid unwanted calls, and in conjunction with other amendments to its TCPA regulations in § 64.1200 *et seq.*, the FCC specifically amended this set of regulations in 2003 by adding § 64.1601(e), which requires telemarketers to transmit caller identification information, including either calling party number . . . or automatic number identification of the calling party's billing number . . . and, when available by the telemarketer's carrier, the telemarketer's name; this regulation also prohibited telemarketers from blocking the transmission of caller identification information.  However, it is not clear whether § 64.1601(e) is promulgated under either subsection b or subsection c of the TCPA[, which expressly grant private rights of action].  Caller ID technology does not fit neatly into the focus of either subsection, neither of which requires the use of such technology to accomplish their respective purposes. *Thus, it is also not clear whether a violation of § 64.1601(e) falls within the private right of action granted by subsection b or subsection c.  It seems just as likely that the FCC may have only intended to ensure consistency between its preexisting Caller ID regulations and its revised TCPA regulations and/or the FTC's regulations pertaining to telemarketing when the FCC promulgated § 64.1601(e)*; those efforts all occurred at the same time, in 2003.  Additionally, the FCC said, "Caller ID requirements will improve the ability of consumers to identify and enforce do-not-call rights against telemarketers."

*Worsham*, 2016 U.S. Dist. LEXIS 118774, at *11-12 (emphasis added; citations omitted). Here, as Plaintiffs must concede, section 64.1601(e) does not expressly convey a private right of action.  They nonetheless contend that the "genesis" of this section implies a private right of action was created because the section references TCPA subsection (c).  However, as *Worsham* concluded, "the FCC's rule in § 64.1601(e) appears to *support* consumers'

enforcement efforts under the TCPA's subsection c, rather than to *create* a separate mechanism upon which a consumer can make an actionable claim." *Id.* at *12 (emphasis in original).

The Court finds *Worsham* persuasive and—in conjunction with the Supreme Court's general guidance—finds section 64.1601(e) does not create a private right of action. The Court declines the invitation to infer a private right of action where section 64.1601(e) is silent on the matter. Accordingly, Claim Six is DISMISSED with prejudice.

### 5.   Claim Eleven (Civil Conspiracy)[16]

Defendants contend Claim Eleven for "civil conspiracy" must be dismissed for failure to properly allege how Plaintiffs "were actually harmed" by Defendants' conduct and for failure to allege "what, if any, actual damage they suffered as a result." (Doc. No. 48 at 22.) Plaintiffs respond: "Of course the general conspiracy [sic] is not a cause of action." (Doc. No. 62 at 23.) The Court's analysis begins and ends with this concession. The purpose of the inclusion of claims in complaints is not, as Plaintiffs contend, "to highlight the agency relationships between the Defendants," and the Court declines to allow the inclusion of an *admittedly improper* claim simply to "highlight[] the agency aspects of the case." (*Id.* at 23-24.) The law could not possibly be more clear that civil conspiracy is a legal theory of liability, not an independent, actionable claim. *Entm't Research Grp., Inc. v. Genesis Creative Grp., Inc.*, 122 F.3d 1211, 1228 (9th Cir. 1997); *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 869 P.2d 454, 457 (Cal. 1994) (holding that conspiracy is not a legal cause of action independent of underlying tort); *see also FDIC v. Tarkanian*, No. 10-CV-980-WQH(BGS), 2012 U.S. Dist. LEXIS 62209, at *12-13 (S.D.

---

[16] As with the motion to dismiss Claim Three, this portion of the motion is untimely. However, the Court proceeds to the merits of the claim in accordance with the Ninth Circuit's signaling guidance in *In re Apple iPhone Antitrust Litig.*, 846 F.3d 313, 319 (9th Cir. 2017).

Cal. May 3, 2012); *Navarrete v. Meyer*, 188 Cal. Rptr. 3d 623, 636 (Cal. Ct. App. 2015). Claim Eleven is DISMISSED with prejudice.[17]

### III.    CONCLUSION

1.    Defendants' motion for partial summary judgment (Doc. No. 50) is GRANTED-IN-PART, and judgment shall be entered in Defendants' favor on the following claims:

    a.    Claim Two ("Junk Fax Law," Cal. Bus. & Prof. Code § 1758.41);

    b.    Claim Seven (Consumer Legal Remedies Act, Cal. Civ. Code §§ 1770 *et seq.*);

    c.    Claim Eight (Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*);

    d.    Claim Nine (Trespass); and

    e.    Claim Ten (Conversion).

2.    Defendants' motion to dismiss (Doc. No. 48) is GRANTED-IN-PART, and the following claims are DISMISSED with prejudice:

    a.    Claim Four (47 C.F.R. § 64.1200(b)(1));

    b.    Claim Five (47 C.F.R. § 64.1200(b)(2));

    c.    Claim Six (47 C.F.R. § 64.1601(e)); and

    d.    Claim Eleven (Civil Conspiracy).

The remainder of the motion to dismiss is DENIED for the reasons explained herein.

/ / /

/ / /

/ / /

/ / /

---

[17] Of course, given that agency is a general theory of liability, the Court's finding does not preclude Plaintiffs from pursuing this legal theory if it is otherwise appropriate, a determination the Court does not make today.

3.     Plaintiffs' motion for partial summary judgment (Doc. No. 61) is DENIED.

4.     Defendants' request for judicial notice (Doc. No. 49) is DENIED as moot.

5.     The Clerk of Court is directed to terminate docket entry 76, which was incorrectly filed as a motion.

**IT IS SO ORDERED.**

DATED:  November 6, 2017

Hon. William V. Gallo
United States Magistrate Judge